IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 10-40060-01-JAR |
| | ) | |
| ANTONIO ESQUIVEL-RIOS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Antonio Esquivel-Rios' Motion for Acquittal Pursuant to Fed. R. Crim. P. 29 (Doc. 102) and Motion for New Trial Pursuant to Fed. R. Crim. P. 33 (Doc. 103). The Government has responded and the Court is prepared to rule. For the reasons explained in detail below, Defendant's motions are denied.

**I.    Background**

The Superseding Indictment charged Defendant with one count of intent to possess methamphetamine, in violation of 21 U.S.C. § 841(a)(1).[1] After an evidentiary hearing, the Court entered a Memorandum and Order denying Defendant's Motion to Suppress.[2] On June 11, 2011, an *in limine* hearing was held, after which the Court granted Defendants' motion *in limine* in part and permitted the Government to present certain evidence.[3] The Court incorporates these orders herein.

---

[1] Doc. 9.

[2] Doc. 29.

[3] Doc. 43.

The case proceeded to trial on August 2, 2011.[4] At the close of the Government's evidence and again, upon the close of Defendant's case before the charges were submitted to the jury, Defendant orally moved for judgment of acquittal, arguing that the evidence was insufficient to sustain a conviction on the count in the Superseding Indictment.[5] The Court overruled and denied the first motion and took the renewed motion under advisement and submitted the case to the jury. The jury returned a guilty verdict against Defendant, and made the additional finding that he possessed 50 grams or more of methamphetamine.[6] Trial counsel Ronald Wurtz was permitted to withdraw,[7] and the Court appointed Michael Jackson to represent Defendant in the post-trial proceedings.[8]

## II. Discussion

### A. Motion for Acquittal

On a motion under Fed. R. Crim. P. 29, the court may not weigh the evidence or assess the credibility of the witnesses.[9] "Rather, the Court must 'view the evidence in the light most favorable to the government and then determine whether there is sufficient evidence from which a jury might properly find the accused guilty beyond a reasonable doubt.'"[10] "Acquittal is proper only if the evidence implicating defendant is nonexistent or is 'so meager that no reasonable jury

---

[4] Defendant was permitted to withdraw his Plea of Guilty entered on June 15, 2011 (Doc. 55).

[5] Doc. 90, Trial Tr. at 382, 394.

[6] Doc. 66.

[7] Doc. 79.

[8] Doc. 80.

[9] *United States v. Parker*, 521 F. Supp. 2d 1174, 1176 (D. Kan. 2007).

[10] *Id.* (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir.1982)).

could find guilt beyond a reasonable doubt.'"[11] Accordingly, as long as the jury's inferences and conclusions are reasonable, the court will not disrupt the verdict.[12] A motion for acquittal at the close of the government's evidence looks only to the evidence adduced during the government's presentation of its case.[13]

In order to prove a § 841(a)(1) violation, the Government must prove the defendant: (1) possessed the controlled substance; (2) knew he possessed the controlled substance; and (3) intended to distribute or dispense the controlled substance.[14] The Government is not required to prove that the defendant knew the precise nature of the controlled substance.[15]

The following is a summary of the evidence presented at trial. On May 11, 2010, at approximately 6:50 a.m., Kansas Highway Patrol Trooper Andrew N. Dean was patrolling his assigned area in Wabaunsee County, Kansas. Dean observed a gold Ford Windstar minivan bearing a Colorado temporary registration tag as it traveled eastbound on Interstate 70, and, pursuant to standard procedure, ran the temporary tag through dispatch. The dispatcher advised the trooper that the registration came back "no return," and that "Colorado temp tags usually don't return." Dean testified that he had encountered Colorado temporary tags before, and had them come back on file when he ran them through dispatch. Dean explained that he asked

---

[11]*Id.* (quoting *White*, 673 F.2d at 301).

[12]*United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005) (citing *United States v. Rahserparian*, 231 F.3d 1257, 1262 (10th Cir. 2000)).

[13]Fed. R. Crim. P. 29; *United States v. Delgado-Uribe*, 363 F.3d 1077, 1082 n.3 (10th Cir. 2004).

[14]*United States v. Bowen*, 437 F.3d 1009, 1014 (10th Cir. 2006). A fourth element was submitted to the jury by way of special interrogatory on the verdict form asking the jury to determine the amount of the controlled substance. *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

[15]*United States v. Johnson*, 130 F.3d 1420, 1428 (10th Cir. 1997).

dispatch whether the temporary tag came back "not on file" or "no return" because he likes to inquire into the exact verbiage so he can explain it to the occupants of the vehicles he stops. "Not on file" typically means the tag is not registered and could be fake or stolen, while "no return" typically indicates that there is no registration yet in the system. Trooper Dean testified that these terms meant virtually the same to him. Dean testified that he stopped the vehicle to verify that the registration was valid.

The van was occupied by three adults: Defendant, a woman, Defendant's brother, Felix and two young children. Defendant was the driver, and produced a valid Colorado driver's license and original registration papers. Trooper Dean found the paperwork to be in order, having been registered on May 10, 2010, the day before the stop. Dean asked Defendant about his travel plans, origination and destination. Defendant answered that he was traveling from Denver to Kansas City, that he worked at Sherwin-Williams, and that he had residences in both states. Dean observed that Defendants' hands shook when he was handling the documents. The trooper also observed two air fresheners on the rear view mirror and one air freshener on the turn signal handle.

After returning the driver's license and registration papers to Defendant, Trooper Dean told him to have a safe trip. Dean stepped back from the van, then stepped back forward and asked Defendant if he could ask him a few questions, and Defendant agreed. Dean asked Defendant to clarify his travel plans, explained that large amounts of drugs were being transported from the west and asked if there were any drugs in the van. Defendant answered "no." Dean then requested permission to search the vehicle. Defendant told him "go ahead," and responded "sure," and "glad to do it," when the trooper asked if he could open the back gate

4

of the van and search under the hood and the passenger compartment. Defendant never asked the search to stop as it progressed.

Trooper Dean first discovered a glass pipe, believed to be used in smoking crack, in the seat near the spot previously occupied by Defendant's brother, Felix. When asked if the pipe belonged to him, Felix answered yes. Dean moved his search to the front of the van, where he noticed the dashboard was shiny and appeared to have been wiped down recently. Upon removing an air vent in the dashboard, the trooper found a cellophane-wrapped package containing a substance later determined to be methamphetamine. Law enforcement also seized four cell phones, a book that appeared to be a Bible, clothing, a large Cabela's bag, and miscellaneous papers, including an undated car wash receipt from Westminster, Missouri. A title to a 2000 S-10 Blazer was also located in the van showing that Defendant purchased the Blazer from Manuel Magallanes Perez, with the transfer bearing Defendant's name and an address on 73rd Street in Kansas City, Kansas.

All occupants of the vehicle were taken into custody and transported to Alma, Kansas where they were met by Trooper David Grittman and Special Agent Robert Taylor of the Drug Enforcement Administration. Defendant invoked his right to counsel upon advisement of his *Miranda* rights, and Agent Taylor did not question Defendant any further. Approximately thirty to forty minutes later, Defendant approached Agent Taylor and indicated he wanted to talk. After consulting the United States Attorney's office, Agent Taylor re-advised Defendant of his *Miranda* rights, and Defendant signed a waiver. Defendant was interrogated by the officers for approximately two hours. Agent Taylor testified that the Windstar Defendant was driving had a bent tag on the front bumper that was registered to Mangallenes in Iowa. Taylor also testified

that, during the interview, he realized the address on the title to the Blazer was connected with another investigation and address in Kansas City. Taylor testified that on August 7, 2009, nine months prior to Defendant's arrest, law enforcement agents conducting surveillance on the trailer at the same address in Kansas City observed three unidentified people working underneath the hood in the firewall area of a minivan driven by Ferid Nadarevic. Law enforcement stopped Nadarevic and found 3.25 kilograms of methamphetamine in the firewall area of the van, and Nadarevic was arrested. A vehicle present at the Kansas City address was registered to Defendant, but he was not identified as one of the individuals present at the scene. When Agent Taylor told Defendant about what happened at the Kansas City trailer, Defendant told him that he rented the property and paid utilities there, that his employees in the carpet installation business stayed there and that he stayed at the trailer during June and July 2009. Defendant also told Taylor that he worked for Sherwin-Williams in Kansas City, although Taylor later learned that Defendant had not worked there for several years. Defendant told Taylor that he would provide information about others involved in drugs if the officers would let the woman and her children go, and that his brother was responsible for the drugs found. Agent Taylor told Defendant that he could not offer any guarantees, and the interview ended.

Agent Taylor further testified that he had undergone special training on narco-trafficking and interdiction, where he learned about unofficial Mexican folk saints, specifically Jesus Malverde and Santa Muerte, the grim reaper. Taylor testified that members of drug cartels have adopted tokens and images of these "narco-saints" as good luck charms. A book titled, "Santa Biblia de law Santa Muerte" was found on the dashboard of the Windstar minivan Defendant was driving and he had a tattoo of Santa Muerte on his back.

Nadarevic testified that he was a drug mule for Magallanes, and that he was en route to Waterloo, Iowa, when the methamphetamine was seized from the minivan. Louis Melchor testified that he sold a kilo of cocaine to Defendant in June 2009, at a trailer in Kansas City. Melchor testified that he had conversations/negotiations with Defendant in Colorado, Iowa and Kansas. Melchor was present at a meeting with Defendant and others, including Nadarevic, in Waterloo, Iowa after the methamphetamine was seized from the van Nadarevic was driving from Kansas City, where the discussion focused on whether Naderevic had actually been stopped by the police.

Defendant's wife, Maria Esquivel-Rios, testified that Defendant was with her in Colorado August 6 through 8, 2009, where they attended a WWE wrestling event and produced a sales receipt showing he purchased exotic boots at a western store that weekend. Mrs. Esquivel-Rios further testified that Defendant would drive from Denver to Kansas City twice a month, where he would stay with people he worked with.

Defendant argues that his actions in giving consent to search the van were the actions of an innocent man. Viewed in the light most favorable to the Government, however, there is sufficient evidence that Defendant was relying on the camouflage provided by his girlfriend and her children as well as the hidden nature of the drugs. Defendant's knowledge and intent to possess the drugs was corroborated by testimony of Agent Taylor regarding the concealment of drugs in the van driven by Nadarevic and the testimony of Nadarevic and Melchor regarding the meeting in Waterloo, Iowa regarding seizure of the methamphetamine from the van Nadarevic was driving. Defendant also argues that the drugs belonged to his brother. Although this might be true, it does not exculpate Defendant, who was in control of the van and whose intent to

possess the drugs was confirmed by the Government's witnesses, as discussed above. While Defendant is correct that mere presence, without more, is insufficient for conviction on the charges against him, the record supports the jury's finding that he knowingly and intentionally possessed the methamphetamine with intent to distribute.

Viewed in the light most favorable to the Government, the Court finds sufficient evidence from which the jury could find Defendant guilty beyond a reasonable doubt on Count 1. Accordingly, Defendant's motion is denied.

### B. Motion for New Trial

Fed. R. Crim. P. 33 states that the court may grant a motion for a new trial "if the interest of justice so requires." A motion for new trial under Rule 33 is not regarded with favor and is granted with great caution.[16] The decision whether to grant a motion for new trial is committed to the sound discretion of the trial court.[17] Defendant raises four grounds in support of his motion for new trial. The Court discusses each in turn.

#### 1. Suppression Motion

Prior to trial, the Court overruled Defendant's motion to suppress, where he challenged the initial stop of his vehicle on the grounds that because his temporary license tag was visible and displayed in accordance with law, Trooper Dean lacked a reasonable suspicion to stop the van based on the dispatch computer results showing the temporary tag "did not return."[18] The

---

[16] *United States v. Herrera,* 481 F.3d 1266, 1269-70 (10th Cir. 2007) (citing *United States v. Trujillo,* 136 F.3d 1388, 1394 (10th Cir.1998)).

[17] *United States v. Custodio*, 141 F.3d 965, 966 (10th Cir. 1998).

[18] Doc. 29 at 6-9.

8

Court also found that the scope of the stop was reasonable, that Defendant's consent was not the fruit of an illegal stop, and that Defendant's consent was voluntary.[19] Defendant asserts that the Court erred in denying his motion to suppress, arguing that Trooper Dean's action was "justified solely on non-particularized and therefore nonexistent suspicion under the guise of ambiguity." Defendant provides no further argument beyond the extensive analysis submitted in his motion to suppress to persuade this Court that the car stop was made in violation of his Fourth Amendment rights or that his consent was not voluntary. The motion for new trial is denied on these grounds.

### 2. Prosecutorial Misconduct

Defendant next argues that he is entitled to a new trial because in his closing remarks, the prosecutor (1) significantly diverted the jury's attention from whether Defendant knowingly possessed a controlled substance with the intent to distribute; (2) prejudiced the jury by stating that society's future as it goes into this century is what is important, not Defendant's case; and (3) appealed to the jury's responsibility to future generations. Defendant also contends that the prosecutor improperly vouched for the credibilty of his cooperating witnesses. The Government categorically denies that there was an incorrect motive in any of the closing arguments to the jury, noting that former trial counsel did not contemporaneously object during closing arguments and that the arguments are quoted out of context.

When a motion for new trial is based on allegations of prosecutorial misconduct, the court applies a two-part test to determine the merits of the claim.[20] "First, [the court]

---

[19]*Id*. at 9-13.

[20]*United States v. Cortez*, No. 06-8078, 2007 WL 3225373, at *4 (10th Cir. Oct. 26. 2007).

9

determine[s] if the conduct was improper. Second, [the court] determine[s] if any improper conduct warrants [a new trial]."[21] In the second step of the analysis, relevant factors are "'the curative acts of the [trial court], the extent of the misconduct, and the role of the misconduct within the case as a whole.'"[22]

Defendant takes issue with the following remarks made by the prosecutor in his closing argument:

> Now, let's talk for a moment about the testimony of Frederick Nadarevic and Mr. Luis Melchor. One of the things that impresses me in my life in the law, ladies and gentlemen, is that individual cases, although they are certainly important, and your job here is important, it's not the individual case in the scheme of things, the ultimate scheme of things, as our country goes into this century. It's not the individual case that's important.[23]

Defendant omits, however, the rest of the prosecutor's statement that belies his argument that the Government's closing amounts to a prohibited "community impact" argument. As the Government points out, the quoted portion of the prosecutor's argument is part of a larger argument informing the jury that they should decide the case dispassionately, based on the evidence, since the greater good for society is served by a just verdict, even if that verdict is not guilty.[24] Accordingly, the Court finds this portion of the prosecution's argument was not improper.

Defendant further argues that the government improperly commented on the evidence, in

---

[21] *See United States v. Bishop*, 469 F.3d 896, 905-06 (10th Cir. 2006).

[22] *Id*. at 906 (quoting *United States v. Gordon*, 173 F.3d 761, 769 (10th Cir. 1999)).

[23] Trial Tr. at 415.

[24] *Id*. at 415-16.

effect vouching for the cooperating witnesses, Nadarevic and Melchor. Defendant points to the following statement:

> I would suggest to you, ladies and gentlemen, that when you saw those witnesses yesterday that a conclusion that you should draw based on what you saw, not what I saw, but what you saw, is that those witnesses were telling the truth about their prior activity. What you saw here demonstrates the truthfulness of their testimony. Do you doubt that Ferid Nadarevic is sincere?[25]

Defendant again takes the prosecutor's statements out of context, as they were part of an argument informing the jury that they were to carefully judge the cooperating witnesses' testimony in light of their cooperation with the Government, to use their common sense and to base their credibility determinations on what they saw, not on anything related to the prosecution.[26] These arguments are correct statements of the law, as reflected in the jury instructions,[27] and are not improper. Defendant's motion for new trial is denied on this issue.

### 3. Rule 404(b) Evidence

Defendant contends that the Court improperly denied his motion *in limine* with respect to the Government's Rule 404(b) evidence. In considering evidence under Rule 404(b), the Supreme Court instructs courts to weigh four factors: (1) whether the evidence is offered for a proper purpose, (2) whether it is relevant, (3) whether the probative value is not substantially outweighed by its potential for unfair prejudice, and (4) whether the court provided a limiting

---

[25] *Id.* at 418.

[26] *Id.* at 417-19.

[27] *See* Doc. 64, Instr. Nos. 17-19, 26-28.

instruction at defendant's request.[28] Evidence is admitted for a proper purpose if allowed for one or more of the enumerated purposes in Rule 404(b). It is relevant if it tends to prove or disprove one of the elements necessary to the charged offense.[29] The danger of unfair prejudice resulting from admission of the evidence must not substantially outweigh the probative value of the evidence under the balancing test of Fed. R. Evid. 403.[30] The limiting instruction must caution the jury to consider the evidence only for the limited purposes for which it is admitted and not as probative of bad character or propensity to commit the charged crime.[31] Whether evidence is relevant for a permissible purpose under Rule 404(b) is left to the discretion of the trial court.[32] Where, as here, a defendant denies possession of a controlled substance or any connection with ongoing criminal activity, the government may offer evidence to show the defendant's

---

[28]*United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006) (citing *Huddleston v. United States*, 485 U.S. 681, 691 (1988); *United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000)). In *United States v. Robinson*, 978 F.2d 1554 (10th Cir. 1992), the Tenth Circuit "urged trial courts to determine that the proffered evidence":

> (1) tends to establish intent, knowledge, motive, identity, or absence of mistake or accident;
> (2) is so related to the charged offense that it serves to establish intent, knowledge, motive, identity, or absence of mistake or accident;
> (3) has real probative value and not just possible worth;
> (4) is close in time to the crime charged; and
> (5) even if relevant, be excluded if the probative value is substantially outweighed by the danger of unfair prejudice.

*Id.* at 1559.

[29]*See* Fed. R. Evid. 401.

[30]*See United States v. Tan,* 254 F.3d 1204, 1211–12 (10th Cir. 2001) (in order for evidence to be inadmissible under Rule 403, the evidence's unfair prejudice must do more than "damage the [d]efendant's position at trial," it must "make[ ] a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged").

[31]*Mares*, 441 F.3d at 1157.

[32]*Id*. at 1156.

knowledge and intent.[33]

After an evidentiary hearing where the Government proffered its evidence, the Court found that Defendant's knowledge and intent were at issue and allowed the Government's Rule 404(b) evidence on a limited basis.[34] Specifically, law enforcement officers were permitted to testify about the surveillance of the Kansas City trailer and that they observed a green car registered to Defendant at the trailer on August 6, 2009; the Court held that all other evidence and circumstances proffered by the Government was not relevant, *e.g.*, wiretaps and the scope of the investigation. Nadarevic was permitted to testify only that he was a drug mule for Magallenes and that methamphetamine was seized from a van he was driving from the Kansas City trailer en route to Waterloo, Iowa. Melchor was permitted to testify only that he previously sold cocaine to Defendant, that he had conversations/negotiations with Defendant in Colorado, Waterloo, Iowa and Kansas, and that he met with Defendant and others, including Nadarevic, in Waterloo, Iowa after methamphetamine was seized from the van Nadarevic was driving from the Kansas City trailer. The Court also gave the jury a limiting instruction regarding the limited purpose of the evidence, both during the trial and as a final instruction.[35] The Court remains convinced that this evidence was properly admitted under Fed. R. Evid. 404(b), and that a new trial is not warranted on these grounds.

    4.    **"Santa Muerte" Book**

Finally, Defendant argues that the Court erred in denying his motion *in limine* to exclude

---

[33]*United States v. Wacker*, 72 F.3d 1453, 1469 (10th Cir. 1995).

[34]Doc. 43; Doc. 86, Hr'g Tr. at 70-73.

[35]Doc. 64, Instr. No. 21.

13

evidence of the book, "Santa Biblia de law Santa Muerte" found on the dashboard of the Windstar minivan. Defendant's former counsel objected to admission of the book as well as any testimony by law enforcement officers concerning the significance of the book on the grounds that it is an unconstitutional infringement on his freedom of religion, it is irrelevant to the issues of this trial, and the potential prejudice from admission of this book and possible accompanying testimony far exceeds any imagined probative value under Fed. R. Evid. 403. The Court denied the motion after the *in limine* hearing, and again the morning of trial when counsel renewed his objection. The Court held that the adherence to the principles of Santa Muerte is not exclusively by those in drug trafficking, but that a law enforcement officer's experience and training indicates that some drug traffickers have these sort of artifacts for protection.[36] The Court further held that any law enforcement testimony to this effect would be as an expert, and that a limiting instruction would be given before the testimony was offered.[37]

Under Rule 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Unfair prejudice within the meaning of Rule 403 "means an undue tendency to suggest decision on an improper basis," commonly an emotional one, wholly apart from the accused's guilt or innocence of the crime charged.[38] As noted by the Government, the evidence

---

[36]Doc. 86, Hr'g Tr. at 34.

[37]*Id*.

[38]*United States v. Tan,* 254 F.3d 1204, 1211-12 (10th Cir .2001) (quotation and citation omitted).

presented at trial did not go into the specific content of the book or Defendant's religion, but rather, that this sort of material is an artifact of the narco-traffic culture similar to a rabbit's foot. The Court remains convinced that this evidence was properly admitted under Rule 403, and that a new trial is not warranted on these grounds.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Acquittal (Doc. 102) and Motion for New Trial (Doc. 103) are DENIED.

**IT IS SO ORDERED.**

Dated: April 5, 2012

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE